RODNEY B. HENDERSON,               )
                                    )
                  Plaintiff,        )
                                    )
        v.                          )        No. 4:08 CV 1123 DDN
                                    )
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
                  Defendant.        )


## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Rodney B. Henderson for a period of continuing disability and Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq.  The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).  (Doc. 7.)  For the reasons set forth below, the ALJ's decision is reversed and remanded.


## I.  BACKGROUND

Plaintiff Rodney Henderson was born on May 7, 1965.  (Tr. 14.)  He is 6'3" tall with a weight that has ranged from 305 pounds to 330 pounds.  (Tr. 14, 649.)  He is single.  (Tr. 531.)  He completed high school and obtained some college credits.  (Tr. 14.)

On September 16, 1997, an ALJ found Henderson was entitled to Disability Insurance Benefits, on the basis of severe degenerative disk disease of the lumbosacral spine, with evidence of nerve root compression at L4-5, and muscle spasms and radiculopathy in the left lower extremity.[1]

---

[1]The human spinal column consists of thirty-three vertebrae.  There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx).  The cervical vertebrae form part of the neck, while the lumbar vertebrae
(continued...)

(Tr. 15, 253-60.)  The period of disability became effective on January 31, 1996.  (258, 261.)  On April 22, 2003, the Social Security Administration found that Henderson was no longer disabled, as of April 15, 2003, because his health had improved and he was able to work.  (Tr. 292-95, 377.)  His entitlement to benefits was to end on June 15, 2003.  (Tr. 14.)  Following a hearing on February 26, 2004, and a supplemental hearing on August 16, 2004, the ALJ affirmed the cessation of benefits on November 12, 2004.  (Tr. 28-42, 265-76, 345-69.)  On appeal to the district court, the district court reversed and remanded the ALJ's decision.  (Tr. 376-85.)  On remand, the ALJ was to provide a more thorough explanation for his decision to discount the opinions of three physicians, each of whom believed Henderson remained disabled.  (Tr. 381 n.2, 384.)

On August 2, 2007, the ALJ held a supplemental hearing.  (Tr. 43-80.)  On October 15, 2007, the ALJ again found that Henderson's disability had ended on April 15, 2003.  (Tr. 11-22.)  On June 27, 2008, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 7-9.)

## II.  MEDICAL HISTORY[2]

From January 1, 2003, to February 26, 2004, Henderson was taking Accupril, Amaryl, Atenolol, Hydrochlorothiazide (HCTZ), Norvasc, Roxicet, and Viagra.[3]  His only prescription for Roxicet was filled on June 16,

---

[1](...continued)
form part of the lower back.  The sacrum is immediately below the lumbar vertebrae.  Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2 (25th ed., Williams & Wilkins 1990).  Radiculopathy is a disease of the spinal nerve roots.  Id., 1308.

[2]Henderson's medical history up until March 1, 2007, is covered in the court's previous opinion.  Henderson v. Astrue, No. 4:06 CV 74 ERW DDN (E.D. Mo. Mar. 1, 2007).  The focus of this memorandum is therefore on the medical records following March 1, 2007.

[3]Quinapril (Accupril), Hydrochlorothiazide, and Norvasc are used to treat high blood pressure.  Amaryl, or Glimepiride, is an anti-diabetic drug used to control high blood sugar.  Atenolol is used to treat chest pain and high blood pressure.  Oxycodone, or Roxicet, is a narcotic used to treat moderate to severe pain.  Viagra is used to treat male sexual
(continued...)

2003.  The prescription was for twenty-two days, and was for a quantity of ninety tablets.  (Tr. 447-48.)

On June 11, 2003, Henderson saw Joseph Hanaway, M.D., a neurologist.  Henderson had injured his back in 1995, while engaged in heavy lifting.  In January 2002, Dr. Matthew Gornet performed a microdiskectomy to repair a herniated disk at L5-S1.[4]  Reviewing the records, Dr. Hanaway was a little confused about whether the herniated disk was at L4-5, or L5-S1.  Earlier records had indicated a herniated disk at L4-5, but over time that problem appeared to have disappeared.  Henderson received some relief from the surgery, but his lower back pain gradually returned.  He did not return to work and continued to have back pain.  Since the surgery, he had not undergone physical therapy and had no further evaluation.  He reported constant back pain and was unable to engage in any lifting carrying, or bending.  A physical exam showed Henderson was "clearly [] in distress," and very uncomfortable because of his back pain.  He was sitting in an awkward position and got up very slowly out of his chair.  (Tr. 577-79.)

A back exam showed Henderson had a clear spasm in the lower lumbar region, from L4-5 down to the sacroiliac level.  He could only bend ten degrees in any direction.  Dr. Hanaway found he was "seriously limited."  Henderson had normal motor function and normal muscle strength in the upper and lower extremities.  Dr. Hanaway found nothing about Henderson's disability had changed, and believed he could not return to work again.  He had "no idea why someone is suggesting that he can go back to work now."  He diagnosed Henderson with a herniated disk, either at L4-5, or

---

[3](...continued)
function problems, such as impotence or erectile dysfunction.  WebMD, http://www.webmd.com/drugs (last visited September 4, 2009).

[4]A discectomy is the surgical removal of herniated disk material that presses on a nerve root or the spinal cord.  WebMD, http://www.webmd.com/back-pain/discectomy-or-microdiscectomy-for-a-herniated-disc (last visited September 4, 2009).  A herniated disk is a protruded or ruptured disk.  The protrusion will compress the nerve root or the cauda equina.  Stedman's Medical Dictionary, 260, 455.  The cauda equina is a collection of nerves below the end of the spinal cord, which travel down the thecal sac and go to the muscles and skin. http://www.neurosurgerytoday.org.

L5-S1 (in which case, it was re-herniated). Dr. Hanaway concluded Henderson had a limitation in all of his activities, and that he remained "permanently unemployable." (Id.)

On March 9, 2004, Henderson saw Rajesh Alla, M.D., at Barnes-Jewish Hospital. Henderson reported good control of his blood sugar and no hypoglycemic episodes. He had no chest pain, shortness of breath, or abdominal pain. A physical examination showed he was in no acute distress, his neck was supple, his lungs were clear, and he had no edema in the lower extremities. Dr. Alla diagnosed Henderson with well-controlled diabetes, well-controlled hypertension, and back pain. Henderson had undergone a microdiskectomy at L5-S1, to repair a herniated disk, and might soon require fusion at L4-5, as well as L5-S1. Because of his injury, Dr. Alla concluded that Henderson had a permanent and total disability, and would be unable to work. Dr. Alla added that Henderson was limited in all activities, and that his disability remained unchanged. In all, the medical note was two pages of handwritten notations. (Tr. 608-09.)

On August 16, 2004, Dr. Alla wrote a "To whom it may concern" letter. The letter reiterated that Henderson had undergone a microdiskectomy to repair a herniated disk at L5-S1, and that he could require surgery at L4-5. Dr. Alla concluded that Henderson had a limitation in nearly all activities, that there had been no change in his back condition, and that he remained disabled. There were no examination notes attached to the letter. (Tr. 613.)

On August 24, 2004, Rony Kampal, M.D. wrote a "To Whom It May Concern" letter. The letter noted that Henderson had suffered a herniated disk at L5-S1, and possibly another at L4-5, as a result of his back injury in 1995. Dr. Kampal concluded that these injuries had left Henderson "permanently and totally disabled due to his chronic back pain." Dr. Kampal added that Henderson was "an exemplary patient" who had tried various types of therapy to alleviate his pain, including microdiskectomy surgery, multiple spinal nerve root injections, physical therapy, and numerous medicine regimens. Despite these efforts, Henderson remained totally disabled, and his discomfort limited his ability to bend, lift, turn, sleep, and sit or stand in the same position

for more than a few minutes. Dr. Kampal concluded that Henderson's condition had not improved in the last few years, and he remained unemployable. (Tr. 615.)

On November 15, 2004, Alan Williams, M.D., reviewed an MRI of Henderson's lumbar spine. The MRI revealed disk dessication and height loss at L4-5 and L5-S1.[5] There was mild disk bulging at L5-S1 with a persistent, moderate-sized central disk herniation. There was contact, displacement, and impingement on the left S1 nerve root/sheath. There was also mild to moderate neural foraminal narrowing, and mild facet osteoarthritis.[6] There was mild disk bulging at L4-5, with an annular tear, and mild facet osteoarthritis, but no canal or neural foraminal narrowing. There were no disk abnormalities at L2-3 or L3-4, and there was no central canal stenosis anywhere.[7] (Tr. 664.)

On April 4, 2005, Henderson saw Dr. Kampal at Barnes-Jewish Hospital. Dr. Kampal diagnosed Henderson with diabetes, under poor control, hypertension, under good control, lower back pain, and a heart murmur. For his back pain, Dr. Kampal refilled his prescription for Roxicet, Ibuprofen, and Elavil.[8] He was to follow-up with the pain clinic. (Tr. 684.)

On December 29, 2005, Henderson went to Barnes-Jewish Hospital. The medical notes indicated Henderson was suffering from diabetes, hypertension, and chronic lower back pain. He had been unable to make it to the foot clinic. He had lost his Medicaid and been unable to

---

[5]Disk dessication is the drying out of the intervertebral disks. Stedman's Medical Dictionary, 422.

[6]The neural foramen is the space through which nerve roots exit the spinal canal to form peripheral nerves. Each foramen is a bony canal formed by the pedicles of two adjacent vertebrae. http://www.medcyclopaedia.com/?tt_topic=. The facet joints are small stabilizing joints located between and behind adjacent vertebrae. See Stedman's Medical Dictionary, 556.

[7]Stenosis is the narrowing or constriction of any canal. Stedman's Medical Dictionary, 1473. Spinal stenosis refers to the narrowing of the spinal cord. See id.

[8]Elavil, or Amitriptyline, is used to treat depression and other mental or mood disorders. WebMD, http://www.webmd.com/drugs (last visited September 4, 2009).

afford his medication. His diabetes and blood pressure were both under poor control. He was to continue taking Elavil, Roxicet, and Ibuprofen. (Tr. 719.)

On April 17, 2006, Henderson went to Barnes-Jewish Hospital, complaining of knots in his stomach. His diagnosis remained diabetes, hypertension, and back pain. For his back pain, he was to follow-up in the pain clinic, and continue taking Roxicet, Ibuprofen, and Elavil. (Tr. 730-31.)

On June 7, 2006, Henderson went to Barnes-Jewish Hospital. His diabetes and hypertension were noted to be in good control, and his back pain was noted to be stable. He was still taking Roxicet. (Tr. 755-56.)

From August 1, 2006, to August 27, 2007, Henderson was taking Aspirin, Atenolol, Avandia, Glimepiride, Glipizide, Glyburide, HCTZ, Ibuprofen, Lantus, Lisinopril, Norvasc, and Oxycodone (Roxicet).[9] Henderson filled his Oxycodone prescription on October 2, 2006, for a period of 22 days, and for a quantity of 90 tablets. On November 3, he filled it for a period of 11 days, and for a quantity of 90 tablets. On February 28, 2007, on May 16, and on August 27, he filled his prescription for 15 days and for a quantity of 120 tablets. By comparison, Henderson filled his Atenolol prescription on September 6, 2006, September 28, October 30, November 28, December 20, January 19, 2007, February 27, March 23, May 1, May 29, June 18, and July 19, each for a period of 30 days. (Tr. 463-73.)

On August 16, 2006, Henderson went to Barnes-Jewish Hospital. The medical notes indicated Henderson was taking Ibuprofen for his lower back pain because he could not afford the Roxicet or other narcotics. He was doing okay with the Ibuprofen, and only taking the Ibuprofen when in extreme pain. (Tr. 761.)

---

[9]Aspirin is used to reduce fever and relieve mild to moderate pain. Avandia, Glipizide, Glyburide, and Lantus are anti-diabetic drugs used to control high blood sugar. Lisinopril is used to treat high blood pressure. WebMD, http://www.webmd.com/drugs (last visited September 4, 2009).

On November 1, 2006, Henderson went to Barnes-Jewish Hospital for a follow-up of his gastroenteritis.[10] All his symptoms had been resolved, and he was doing well, with no complaints. He had been on Roxicet for the past two years, and was taking his medication twice a day, every other day. He had tried taking Advil and Tylenol for relief, but found he was taking too many at a time to get relief. The doctor diagnosed Henderson with diabetes, well-controlled hypertension, and lower back pain, with an unsuccessful attempt to get off his pain medication. A physical exam showed Henderson was feeling okay. His pain scale was 0/10. Now that he was back on Medicaid, he was in the process of obtaining a glucometer. He was taking Roxicet, every other day, in the morning, and then improving through the day. (Tr. 788-89.)

On December 20, 2006, Henderson went to the Barnes-Jewish Hospital for a foot examination, as part of his diabetes care. He did not have any foot pain, his ambulation was independent, and his gait was normal. At the time, he was taking Accupril (Quinapril), Amaryl, Aspirin, Atenolol, Avandia, Glimepiride, HCTZ, Lantus, Norvasc, Quinapril, and Roxicet. (Tr. 792-93.)

On February 28, 2007, Henderson went to Barnes-Jewish Hospital, complaining of lower back pain. Henderson had been taking Roxicet for the past two years. He had tried taking Advil or Tylenol instead, but those drugs did not provide pain relief. Henderson was back on Medicaid, but had not been able to obtain a glucometer to check his diabetes. He denied any hypoglycemic symptoms. The doctor diagnosed Henderson with diabetes, hypertension, which was well controlled with medication, lower back pain, and a heart murmur. Henderson had quit smoking two months ago, and his weight was down to 298 pounds. His pain scale was 7/10. The note indicated he was "only requiring refills [of Roxicet] every 3-4 months," since his last refill had been in November of 2006. At the same time, his prescription recommended taking two tablets every six hours, as needed. (Tr. 795-97.)

On March 19, 2007, Henderson went to Barnes-Jewish Hospital, complaining of backaches, diabetes, and hypertension. He was living at

---

[10]Gastroenteritis is inflammation of the mucous membrane of both the stomach and intestine. Stedman's Medical Dictionary, 636.

home with his mother.  A physical assessment showed Henderson had a normal gait, soft heels, no edema, no calluses, and no ulcers.  He noted no foot pain.  (Tr. 799-800.)  Henderson also received diabetes counseling.  During the session, he noted not smoking, not drinking, but also not really exercising.  (Tr. 801.)

On May 16, 2007, Henderson went to Barnes-Jewish Hospital.  He had been taking Tylenol and Advil since his back surgery, and Roxicet when the pain got worse.  Henderson had participated in physical therapy, occupational therapy, and a pain clinic, but not recently.  Over the last two to three days, he was experiencing bad back pain - "he had been doing increased physical activity and that usually aggravate[d] his pain."  The pain was worse after sitting for a long time.  His pain scale was 8/10. His most recent MRI, from 2004, showed persistent, moderate-size central disk herniation at L5-S1, with displacement and impingement of the S1 nerve root.  There was also neural foraminal narrowing at L5-S1. Henderson was not willing to have surgery again, because the surgery would involve spinal fusion.  Henderson preferred to simply deal with the pain.  Beyond the back problems, he was doing well.  He denied any chest pain and shortness of breath.  He weighed 303 pounds.  A physical examination showed Henderson was in no acute distress, had clear lungs, a regular heart rate and rhythm, no edema, and a soft abdomen.  His sensation was intact throughout, he had 4+/5 strength throughout, with no focal deficits.  Hilary Reno, M.D., diagnosed Henderson with lower back pain, and noted Henderson was "in intense pain," likely from over-exertion, but with "[n]o pain seeking behavior noted."  She referred him to an orthopedist.  Dr. Reno also diagnosed him with improved diabetes, well-controlled hypertension, and a heart murmur.  His prescription for Roxicet remained two tablets every six hours, as needed.  (Tr. 804-05.)

On May 31, 2007, Joanne Lacey, M.D. reviewed an MRI of Henderson's lumbar spine.  Dr. Lacey noted mild degenerative retrolisthesis of L5 and S1.[11]  The sagittal alignment was otherwise normal, the conus was positioned at L1, cord signal was normal, and there was nothing abnormal

---

[11]Retrolisthesis is posterior slippage of one vertebra onto another. University of Chicago Medical Center, http://www.uchospitals.edu/online-library/content=P01158#R (last visited September 4, 2009).

about the focal marrow signal.  There was mild bilateral arthropathy at
L2-3, L3-4, L4-5, and L5-S1, but there was no canal or neural foraminal
narrowing at either L1-L2, L2-3, or L3-4.[12]  There was an annular fissure
at L4-5, with a mild asymmetric bulge and mild narrowing.  There was
central herniation with a mild generalized disk bulge at L5-S1, and a
left posterolateral annular fissure.  The left S1 nerve root was
compressed, and there was mild right and moderate left neural foraminal
stenosis.  (Tr. 810.)

On June 18, 2007, Henderson went to Barnes-Jewish Hospital for a
foot assessment.  He was able to walk independently, and had a normal
gait.  His heels were soft and he had no edema.  Henderson noted his foot
pain was 1/10.  His prescription for Roxicet remained two tablets every
six hours, as needed.  (Tr. 812-13.)

**Testimony at the Hearing**

On August 2, 2007, Henderson testified before the ALJ.  Henderson
lived with his mother and uncle.  He did not drive because he had never
gotten his license.  He graduated high school and had taken vocational
computer classes sometime in the 1980s.  He last worked at Schnucks
Bakery, as the lead man working on the loading dock.  As part of the job,
he loaded and unloaded the trucks with racks full of trays of bread and
donuts.  He lifted up to fifty or sixty pounds a day.  Henderson worked
at Schnucks for ten years, until he stopped in 1995.  (Tr. 43-51.)

Henderson believed he could no longer work because of his back.
Getting out of bed and doing simple housework was difficult because of
his back.  For instance, if he was washing dishes, he would have to take
a break to sit down, before finishing.  In fact, whatever chores he was
doing around the house, Henderson had to sit and take a break before he
could finish.  He could lift a gallon of a milk, but not in each hand.
Dr. Matthew Gornet had performed surgery on Henderson's back, but he had
not seen Dr. Gornet for three or four years.  That surgery had mainly
served to alleviate some of Henderson's pain, but he still experienced
pain, and reported taking six pills of Roxicet and Oxycodone a day.  He

---

[12]Arthropathy is any disease affecting a joint.  Stedman's Medical
Dictionary, 136.

had been taking that amount for the past three years, though he was careful not to exceed that dosage. He also took prescription Ibuprofen for moderate pain. Henderson had participated in physical therapy before and after his back surgery, but found it did not really work, and even made the pain worse. He had also been to a pain control center after his surgery, but with little success. (Tr. 51-55.)

Beyond surgery, Henderson's doctors had not suggested any other type of pain control treatments, such as Epidural shots, trigger point injections, a Morphine pump, or a TNS unit. The pain was centered in the lower back and sometimes radiated down his left leg. Henderson wore a back brace to help with the pressure on his back. During the day, he had to constantly move around; sitting, laying, or standing for too long aggravated his back. His doctors had not changed his pain medication or given him any pain patches. He remained on the Roxicet, which helped to ease the pain, though he still experienced some pain. The Roxicet made him drowsy. (Tr. 55-58.)

The pain bothered Henderson at night, and made it difficult to sleep. He had taken Amitriptyline, but stopped taking it because it made him drowsy the following day. Henderson used to take muscle relaxers, but stopped because they were ineffective. Henderson had weakness and numbness in his left leg and foot. His doctors had suggested he lose weight, and he had reduced his weight from 330 pounds to 305 pounds. He also believed he needed to lose weight to help his diabetes condition, and had been eating less. (Tr. 58-60.)

In a typical day, Henderson watched television and moved around the house as much as he could. He got bored frequently. Sometimes he might go to the mall or the zoo with a friend to get out of the house, though he made sure to bring his pain medication, and to rest as needed. Still, he usually stayed at home. Henderson thought he could stand for about fifteen or twenty minutes before he experienced pain and had to sit down. He thought he could sit for about five to ten minutes before he had to stand. He usually took about six Roxicet pills and four Ibuprofen pills in a day. (Tr. 60-63.)

Henderson had some difficulty caring for his personal hygiene. Tying his shoes and bathing was usually a problem, and he had trouble

reaching for items. Henderson usually had Medicaid, but Medicaid had recently asked for a spend down, and he could not contribute because he had not received a Social Security check in three years. He was uninsured and unable to purchase much of his medication. (Tr. 63-65.)

His Medicaid problems began about a month earlier, and he was still able to seek treatment at the Lowell Clinic. Henderson took five different medications for blood pressure, and three medications for his diabetes. He was unable to afford two of his diabetes medications, but got a sample of one, and was working to get into a program for low-income individuals. (Tr. 65-68.)

Henderson saw his doctors once every three months. He had recently gone for an MRI, after telling his doctor he was in pain. Henderson usually got up around three or four o'clock in the morning, and went to bed around eleven or twelve o'clock. Henderson had to lay down around three or four times during the day, for ten to thirty minutes. He was able to squat, but could not bend. He sat in his home recliner until his back hurt, and then got up. Sitting also caused his leg problems, and Henderson limped when his leg hurt. He had received a few epidural injections in his back before the surgery, but none since. He walked a block to the filling station because his doctor recommended getting up to help his diabetes. Walking a block took about ten minutes, and Henderson needed to walk with a cane. He did not have a regular exercise program. (Tr. 68-74.)

W. Glenn White testified as a vocational expert (VE) during the hearing. The ALJ had the VE assume Henderson could lift ten pounds frequently and twenty pounds occasionally, stand, walk, and sit for six hours in an eight-hour workday, and occasionally stoop or crouch, but needed to avoid vibration and climbing. Under these circumstances, Henderson could not return to his past work, but could perform work at an unskilled, entry-level assembler job. If the ALJ had the VE assume Henderson could lift only ten pounds occasionally and stand or walk for two hours in an eight-hour workday, Henderson could perform sedentary assembler jobs, of which there were about 1,000 in Saint Louis. If Henderson needed to have some discretion with respect to sitting and standing during the day, the VE testified that the assembler jobs would

no longer be available.  If Henderson had to take unpredictable breaks, that would also be incompatible with work.  If Henderson could not repetitively reach in front of his body, that would impact the assembler jobs.  (Tr. 74-80.)

### III.  DECISION OF THE ALJ

The ALJ found that Henderson's disability had ended on April 15, 2003.  The ALJ began the opinion by summarizing Henderson's testimony from the hearing.  The ALJ found Henderson had an excellent work record up to his established date of disability on January 31, 1996.  But despite this positive work history, the ALJ found the evidence in the record to be inconsistent with Henderson's allegation of disability beyond April 14, 2003.  The ALJ noted that Henderson was obese, but found there was no credible evidence that his obesity played any role, either on its own or in combination with other impairments, in diminishing his mobility or stamina, or in reducing his overall functional abilities. Henderson suffered from diabetes and hypertension, but there was no documented evidence of significant secondary damage to his eyes, heart, brain, or kidneys.  (Tr. 14-17.)

Henderson's chief complaint was back pain.  During one visit, he stated his pain was 7/10.  Yet, there was no evidence that Henderson ever followed-up with a pain management clinic, as he was instructed to do. In June 2006, his back pain was stable.  In August 2006, Henderson could not afford his pain medication, so he relied on Ibuprofen.  In February 2007, Henderson reported taking Roxicet twice a day, but only needed to refill it once every three to four months.  In May 2007, Henderson reported that he had no recent physical or occupational therapy, and that his back pain would come and go.  He had no neurological symptoms, and Henderson said he was unwilling to have surgery.  An MRI indicated no interval change at L5-S1 and mild facet arthropathy from L2 to L4, but no longer showed an annular tear at L4-5.  (Tr. 17-18.)

The ALJ found Henderson's back pain prevented him from performing his past work.  However, the ALJ believed he could perform light work, as long as the work did not involve repetitive stooping, bending, crouching, climbing, or exposure to vibrations.  The VE testified that

sedentary assembler jobs satisfied these criteria. The ALJ discounted the opinion of Dr. Hanaway, because he had only seen Henderson once, and that had been for litigation purposes, not treatment purposes. He had also seen Henderson before he began taking Roxicet. Dr. Alla's statement from March 2004, was simply a restatement of Dr. Hanaway's report. The ALJ found Dr. Kampal's report from August 2004 to be misleading. Dr. Kampal stated that Henderson had pursued a number of different treatments, yet he did not start taking Roxicet until June 2003. He took Elavil from August 2004 to June 2006, but did not change his dosage in two years. From June 2004 to May 2007, his pain level was usually 4/10 or 5/10, and sometimes 7/10 - not indicative of extreme pain. Finally, Henderson made little effort to lose weight, attend physical or occupational therapy, or go to a pain management clinic. (Tr. 18-19.)

The ALJ found Henderson provided inaccurate testimony. During his first hearing, he reported taking prescription pain medication every six hours. Yet, pharmacy records failed to support this allegation, indicating Henderson had only taken twenty-two tablets in eight months. He also exaggerated the restrictions imposed by Dr. Gornet after his first surgery. Throughout Henderson's treatment, the ALJ found his dosage remained the same. (Tr. 19.)

Henderson had back problems: he had a herniated disk, and had undergone back surgery. However, the ALJ found the medical records failed to support the alleged severity of his symptoms or the frequency with which he took pain medication. Henderson had not undergone any other surgeries or inpatient hospitalizations. He had not had any epidural or pain injections, and had recently stated that he preferred to live with the pain. He had failed to comply with treatment suggestions such as physical or occupational therapy, orthopedic treatment, or pain management. Pharmacy records contradicted his pain medication consumption. He went to Barnes-Jewish infrequently, and for his diabetes as much as for his back. There was no evidence he needed to elevate his feet or lay down during the day. He usually alleged only mild pain, 4/10 or 5/10. (Tr. 19-20.) "His complaints of severe back pain are rare and episodic, not constant." (Tr. 20.)

Henderson was neither perfectly healthy, nor pain-free – and likely would never be either again. But the ALJ found his allegation that he was unable to perform any job to be not credible. The ALJ found that Henderson had the RFC to lift or carry ten pounds frequently and twenty pounds occasionally, but needed to avoid repetitive stooping, bending, and crouching, and could not climb ladders, climb ropes, or endure vibrations. The ALJ concluded that Henderson could not perform either his past work or the full-range of light-sedentary work, but that his RFC allowed him to perform the light and sedentary jobs identified by the VE. Accordingly, he was not disabled within the meaning of the Social Security Act, and his disability ceased on April 15, 2003. (Tr. 20-22.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen

v. Yuckert, 482 U.S. 137, 140–42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the Commissioner determined that Henderson could not perform his past work, but that he maintained the RFC to perform other work in the national economy.

## V. DISCUSSION

Henderson argues the ALJ's decision is not supported by substantial evidence. First, Henderson argues that the ALJ again failed to cite medical evidence to support his decision to discount the medical opinions of Dr. Hanaway, Dr. Alla, and Dr. Kampal. Second, he argues that the ALJ failed to cite medical evidence to support his RFC determination. Third, he argues the ALJ failed to properly consider his subjective complaints. Fourth, he argues the ALJ's hypothetical question was flawed. (Doc. 18.)

### Medical Opinions

Henderson argues that the ALJ again failed to cite medical evidence to support his decision to discount the medical opinions of Dr. Hanaway, Dr. Alla, and Dr. Kampal. In particular, he argues Dr. Hanaway is the only specialist to have seen him. He also argues the ALJ failed to give an adequate reason for discounting the opinion of Dr. Alla. In contrast, he argues Dr. Gornet's opinion from 2002 is no longer current, and the ALJ erred by continuing to rely on that outdated opinion. Henderson

argues that the opinion of Dr. Gornet and of the non-examining physician are all that support the ALJ's decision, and this evidence fails to satisfy the substantial evidence standard.

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. <u>Id.</u> Normally, the opinion of the treating physician is entitled to substantial weight. <u>Casey v. Astrue</u>, 503 F.3d 687, 691 (8th Cir. 2007). The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight. <u>Singh v. Apfel</u>, 222 F.3d 448, 452 (8th Cir. 2000).

Still, the opinion of the treating physician is not conclusive in determining disability status, and must be supported by medically acceptable clinical or diagnostic data. <u>Casey</u>, 503 F.3d at 691. The ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by better or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent. <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 803 (8th Cir. 2005); <u>Cantrell v. Apfel</u>, 231 F.3d 1104, 1107 (8th Cir. 2000). In determining how much weight to give a treating physician's opinion, the ALJ must consider the length of the treatment relationship and the frequency of examinations. <u>Casey</u>, 503 F.3d at 692.

In this case, the ALJ discounted the opinions of Dr. Hanaway, Dr. Alla, and Dr. Kampal. The ALJ discounted the opinion of Dr. Hanaway because he was a consulting doctor who had only examined Henderson one time. In addition, the ALJ noted that the exam had been for litigation purposes. Henderson's own testimony supports this analysis. During the hearing on February 26, 2004, the ALJ and Henderson engaged in the following exchange:

```
Q:   How did you get to Dr. Hanaway?
A:   A friend drove me.
Q:   No.  I mean what made you decide to see him?  Did Dr.
     Gornut [sic] . . . send you to him, or Dr. Allah [sic]?
A:   Who was it that send me to him?  I think it was my
     lawyer, Harry Nicholson.
```

```
Q:   Okay, have you seen him since?
A:   Dr. Hanaway?  No sir.
Q:   Any particular reason?
A:   I asked him do I need to come back and he told me there
     wasn't too much more he could do for me, gave his report
     and told me just take it easy . . . just basically take
     one day at a time.  There wasn't too much he could do
     for me anymore.
```

(Tr. 363-64.)

Under <u>Singh</u>, the opinion of a consulting physician who examines a claimant once "does not generally constitute substantial evidence." <u>Singh</u>, 222 F.3d at 452.  This is true whether the one-time examination was at the request of the Social Security Administration, or at the request of the claimant or his lawyer.  <u>Henderson v. Sullivan</u>, 930 F.2d 19, 21 (8th Cir. 1991) ("We have consistently discounted the opinions of non-treating physicians who have seen the patient only once, at the request of the Social Security Administration.  There is no reason to treat differently the opinion of a non-treating physician who has seen the patient only once, at the request of the patient or her lawyer.").  Looking to <u>Singh</u> and <u>Henderson</u>, the ALJ properly discounted the opinion of Dr. Hanaway.

The ALJ also discounted the opinion of Dr. Alla, finding his statement merely reiterated the earlier statement from Dr. Hanaway.  In March 2004, Dr. Alla saw Henderson for a routine follow-up.  His medical notes from the visit largely concerned Henderson's blood sugar levels, and a description of his recent lab results.  There was no detailed examination of Henderson's back or spine.  Dr. Alla simply noted that Henderson was positive for back pain.  And yet, Dr. Alla also noted that he was in no acute distress - unlike Dr. Hanaway, who had found Henderson clearly distressed.  Dr. Alla's conclusion that Henderson was "unable to work," and had "a permanent and total disability" is therefore unsupported by his treatment notes.  The ALJ correctly discounted this opinion as internally inconsistent.  <u>Cantrell</u>, 231 F.3d at 1107.  The ALJ also correctly discounted the opinion as conclusory, noting it was all but a word-for-word recitation of Dr. Hanaway's earlier statement.  <u>Compare</u> (Tr. 609) ("He has limitation in all activities including bending, lifting, pushing, pulling, standing, and sitting."), <u>with</u> (Tr.

579) (He has limitation in all of his activities, bending, lifting, pushing, pulling, working with his arms over his head, standing, and sitting."). Dr. Alla's letter from August 16, 2004, contains the same conclusory statement as his diagnosis from March 2004. Compare (Tr. 609), with (Tr. 613). The ALJ properly discounted the opinions of Dr. Alla. See Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992) (noting that a conclusory diagnosis letter does not overcome substantial evidence to the contrary).

Finally, the ALJ discounted the report of Dr. Kampal as unsupported by the record. Like Dr. Alla, Dr. Kampal's September 2004 statement took the form of a conclusory, "To Whom It May Concern" letter. There were no examination notes accompanying the letter. In the letter, Dr. Kampal noted that Henderson had been an exemplary patient, "willing to try every therapy offered to him in an attempt to relieve his pain," including surgery, spinal nerve root injections, physical therapy, and numerous medicine regimens. (Tr. 615.) Yet, Dr. Hanaway noted Henderson had not participated in physical therapy. Henderson said as much during the hearing, noting that his doctor had not recommended any therapy, "because he didn't think it would do any good." (Tr. 354.) Finally, the prescription records from January 2003 to February 2004, indicated Henderson was not taking regular pain medication. During that period, he regularly filled prescriptions for his diabetes, high blood pressure, chest pains, and erectile dysfunction, but only filled one prescription for Roxicet, his pain medication. Looking to the record, the ALJ properly discounted the opinion of Dr. Kampal as being inconsistent with the record. See Pearsall, 274 F.3d at 1219.

**Subjective Complaints**

Henderson argues the ALJ failed to properly consider his subjective complaints. He argues the opinions of Dr. Hanaway and the other doctors detracts from the ALJ's credibility determination. In addition, Henderson notes he had an excellent work record, and that his daily activities did not contradict his complaints of disabling pain. Finally, he notes that he did not take narcotic pain regularly because he was unable to afford it.

The ALJ must consider a claimant's subjective complaints. <u>Casey</u>, 503 F.3d at 695 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)). In evaluating subjective complaints, the ALJ must consider the objective medical evidence, as well as the so-called <u>Polaski</u> factors. <u>Guilliams</u>, 393 F.3d at 802. These factors include: 1) the claimant's prior work history; 2) the claimant's daily activities; 3) the duration, frequency, and intensity of the claimant's pain; 4) precipitating and aggravating factors; 5) dosage, effectiveness, and side effects of medication; and 6) functional restrictions. <u>Id.</u>; <u>O'Donnell v. Barnhart</u>, 318 F.3d 811, 816 (8th Cir. 2003). While these factors must be taken into account, the ALJ does not need to recite and discuss each of the <u>Polaski</u> factors in making a credibility determination. <u>Casey</u>, 503 F.3d at 695.

The ALJ may discount subjective complaints of pain when the complaints are inconsistent with the evidence as a whole. <u>Id.</u> However, the ALJ <u>may not</u> discount a claimant's allegations of disabling pain simply because the objective medical evidence does not fully support those claims. <u>O'Donnell</u>, 318 F.3d at 816. When rejecting a claimant's complaints of pain, the ALJ must "detail the reasons for discrediting the testimony and set forth the inconsistencies found." <u>Guilliams</u>, 393 F.3d at 802. If the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the reviewing court "will normally defer to the ALJ's credibility determination." <u>Casey</u>, 503 F.3d at 696.

The ALJ set out the <u>Polaski</u> factors in his decision, and addressed several of the factors in discounting Henderson's subjective complaints. The ALJ noted that Henderson had a good work record, up until his injury. On the other hand, the ALJ noted that Henderson claimed to take Roxicet twice a day, but that the records revealed he refilled his prescription only once every three to four months. More to the point, the ALJ found Henderson's dosage had remained largely unchanged. The ALJ also chose to discredit Henderson because he did not require additional surgery or hospitalization, receive epidural injections, or attend pain management clinics, physical therapy, or occupational therapy. The ALJ also noted that Henderson did not attend the Barnes-Jewish Hospital clinic very

frequently, and that his complaints of severe back pain were episodic, rather than constant.

The record supports some, but not all, of the ALJ's analysis. The ALJ correctly found that Henderson had exaggerated his pain medication levels. At the hearing, Henderson testified that he took six Roxicet tablets a day. (Tr. 53.) Even though his doctors prescribed two tablets every six hours, as needed, his prescription records showed that he did not refill his November prescription of 90 tablets until February 2007. (Tr. 795, 815, 463-73.) After that, 120 tablets lasted him until May 16, 2007, and another 120 tablets lasted him until August 27. For 2007, Henderson was taking, on average, less than two tablets a day. (Tr. 463-73.)

On the other hand, Henderson told Dr. Reno he had participated in pain clinics, and physical and occupational therapy, but not recently. (Tr. 804.) During the hearing, Henderson testified that physical therapy and pain control centers had not worked for him, and if anything, only served to aggravate his pain. (Tr. 54.) During an earlier hearing, Henderson testified that his doctor had not recommended therapy because he thought it would not help. (Tr. 354.) If these treatments were ineffective, Henderson had an excuse for his non-compliance. See Mitchell v. Astrue, Civil No. 07-5137, 2008 WL 821846, at *3 (W.D. Ark. Mar. 26, 2008) ("Failure to follow a prescribed course of treatment can be excused if such failure is because the medication is ineffective in treating the impairment."); see also Ribaudo v. Barnhart, 458 F.3d 580, 585 (7th Cir. 2006) ("[The claimant's] failure to pursue ineffective treatments does not suggest that he is not in severe pain, and therefore cannot be a sound basis for the ALJ's adverse credibility finding."). The ALJ did not evaluate whether these treatments were ineffective, as Henderson claimed. Instead, the ALJ used the absence of these treatments to conclude that Henderson was not credible. Looking to Mitchell and Ribaudo, this was improper.

Henderson also expressed a willingness to avoid spinal fusion surgery. Spinal surgery is a dangerous and painful surgery. Schena v. Sec'y of Health and Human Servs., 635 F.2d 15, 20 (1st Cir. 1980). Given the risks associated with such a procedure, a claimant should not be

faulted for pursuing other treatment options.  Id.  "It is not the
claimant's burden to undergo any and all surgical procedures" suggested
by his physician, lest he be "barred from disability benefits."  Id. at
19; see also Hephner v. Mathews, 574 F.2d 359, 362 (6th Cir. 1978) ("The
Secretary's reliance on appellant's refusal to undergo a surgical spinal
fusion does not support a denial of benefits.").  In 2002, Henderson
underwent a microdiskectomy to repair a herniated disk at L5-S1.  Yet,
MRIs in November 2004 and May 2007 still revealed a mild disk bulge and
central disk herniation at L5-S1.  Under the circumstances, Henderson
cannot necessarily be faulted for avoiding a second back surgery.

Finally, the ALJ noted that Henderson visited the clinic
infrequently, and that his allegations of pain were mild, usually in the
4/10 or 5/10 range.  The record does not support this finding.  In
February 2007, he reported his pain as 7/10.  In May 2007, he reported
his pain as 8/10.  Indeed, during the May visit, Dr. Reno observed that
Henderson was "in intense pain," and without any sign of "pain seeking
behavior." (Tr. 804-05.)

Taken together, the ALJ did not give good reasons for discrediting
Henderson's subjective complaints of pain.  On remand, the ALJ shall
reconsider the evidence.  The ALJ should also include a discussion of
Henderson's daily activities.


**Residual Functional Capacity**

Henderson argues the ALJ failed to cite medical evidence that would
support his RFC determination.

The RFC is a function-by-function assessment of an individual's
ability to do work-related activities based on all the evidence.  Casey,
503 F.3d at 696.  The ALJ retains the responsibility of determining a
claimant's RFC based on all relevant evidence, including medical records,
observations of treating physicians, examining physicians, and others,
as well as the claimant's own descriptions of his limitations.  Pearsall,
274 F.3d at 1217-18.  Before determining a claimant's RFC, the ALJ must
evaluate the claimant's credibility.  Id.  Ultimately, the RFC is a
medical question, which must be supported by medical evidence contained

in the record. <u>Casey</u>, 503 F.3d at 697; <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001).

Because the ALJ must reconsider Henderson's subjective complaints of pain, the question of Henderson's RFC is reserved for the ALJ upon remand.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded.  On remand, the ALJ shall (1) reconsider Henderson's subjective complaints of pain, and in doing so discuss Henderson's daily activities; and (2) consider ordering a consultative examination, to supplement the record with current medical information.  <u>See</u> 20 C.F.R. § 404.1519a.

An appropriate Judgment Order is issued herewith.


    /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on September 25, 2009.